**No. 25-724**

---

# IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

---

KEVIN DUDEN,

*Plaintiff-Appellant*,

v.

STATE OF WASHINGTON, ET AL.,

*Defendants-Appellees.*

---

On Appeal from the United States District Court for the
Eastern District of Washington at Richland
No. 4:24-cv-05047-SAB
The Honorable Stanley A. Bastian

---

## APPELLEES' ANSWERING BRIEF

---

NICHOLAS W. BROWN
  *Attorney General of Washington*

ZACHARY J. PEKELIS
MEHA GOYAL
  *Special Assistant Attorneys General*
PACIFICA LAW GROUP LLP
401 Union Street, Suite 1600
Seattle, WA 98101-2668
Telephone:  206-245-1700
Facsimile:  206-245-1750

*Attorneys for Defendants-Appellees*
*State of Washington and Washington*
*State Department of Corrections*

# TABLE OF CONTENTS

INTRODUCTION ....................................................................... 1

JURISDICTIONAL STATEMENT ..................................... 4

STATEMENT OF ISSUES PRESENTED FOR
    REVIEW........................................................................ 4

STATEMENT OF THE CASE ............................................ 5

  A. The COVID-19 Pandemic and
     Washington's Response............................................ 5

  B. COVID-19's Impact on DOC ................................. 6

  C. The Delta Surge and Proclamation 21-14 ........... 7

  D. DOC's Exemption and Accommodation
     Process ..................................................................... 8

  E. Duden's Employment With DOC............................ 9

  F. Duden's Accommodation Request......................... 12

  G. DOC's Denial of Duden's Accommodation
     Request ................................................................... 15

  H. Procedural History................................................. 17

STANDARD OF REVIEW ................................................. 19

SUMMARY OF ARGUMENT ........................................... 20

ARGUMENT ...................................................................... 21

  I.   Accommodating Duden Would Have
     Caused DOC Undue Hardship ............................. 22

    A. Title VII's Undue Hardship Standard............... 22

B.  Under *Petersen*, Duden's Increased Risk of Spreading COVID-19 Constitutes an Undue Hardship ......................................................25

    1.  The essential functions of Duden's position required him to have close contact with others .........................................26

    2.  The available scientific data showed vaccination was critical to managing the spread of COVID-19 ...............................30

    3.  The unrebutted evidence showed that masking and testing alone were inadequate .........................................................36

C.  Duden's Working Remotely or Taking Paid Leave Would Have Imposed an Undue Hardship on DOC .....................................................40

D.  The State Does Not Need to Provide Cost Data to Prove Undue Hardship Under Title VII ..................................................................42

II.  DOC Initiated Good Faith Efforts to Accommodate Duden's Religious Practices ......44

CONCLUSION ..................................................................49

# TABLE OF AUTHORITIES

**Federal Cases**

*Adams v. Retail Ventures, Inc.*,
325 F. App'x 440 (7th Cir. 2009) ..............................41

*Am. Postal Workers Union v. Postmaster General*,
781 F.2d 772 (9th Cir. 1986) (per curiam)................45

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) .................................................19

*Andrade v. Mass. Dep't of Corr.*,
No. 22-11899-FDS, 2025 WL 319563
(D. Mass. Jan. 13, 2025)...........................................34

*Ansonia Bd. of Educ. v. Philbrook*,
479 U.S. 60 (1986) ...................................................46

*Balint v. Carson City*,
180 F.3d 1047 (9th Cir. 1999) (en banc) ..................44

*Beickert v. N.Y.C. Dep't of Educ.*,
No. 22-CV-5265(DLI)(VMS), 2023 WL 6214236
(E.D.N.Y. Sept. 25, 2023) .........................................40

*Bragdon v. Abbott*,
524 U.S. 624 (1998) .................................................23

*Bruff v. N. Miss. Health Servs., Inc.*,
244 F.3d 495 (5th Cir. 2001) ...................................47

*Bushra v. Main Line Health, Inc.*,
No. 24-1117, 2025 WL 1078135
(3d Cir. Apr. 10, 2025) ...................................... passim

*Chavez v. S.F. Bay Area Rapid Transit Dist.*,
No. C 22-06119 WHA, 2024 WL 4371002
(N.D. Cal. Oct. 1, 2024) ...........................................28

*Cooper v. Oak Rubber Co.*,
15 F.3d 1375 (6th Cir. 1994) ...................................41

*Dixon v. Bessent*,
No. 24-5110, 2025 WL 1720742
(D.C. Cir. June 20, 2025) (per curiam) .....................30

*Doe 1 v. NorthShore University HealthSystem*,
No. 21-cv-05683,
2021 WL 5578790 (N.D. Ill. Nov. 30, 2021)........38, 39

*EEOC v. TriCore Reference Labs.*,
849 F.3d 929 (10th Cir. 2017) .................................28

*Florida v. Dep't of Health & Hum. Servs.*,
19 F.4th 1271 (11th Cir. 2021).................................5

*Gordon v. Virtumundo, Inc.*,
575 F.3d 1040 (9th Cir. 2009) .................................19

*Green v. United Parcel Serv., Inc.*,
No. CV 18-8744, 2019 WL 1430244
(E.D. La. Mar. 29, 2019)..........................................28

*Groff v. DeJoy*,
600 U.S. 447 (2023) ....................................19, 22, 40

*Health Freedom Def. Fund., Inc. v. Carvalho*,
148 F.4th 1020 (9th Cir. 2025) (en banc)..........passim

*Heller v. Ebb Auto Co.*,
8 F.3d 1433 (9th Cir. 1993) ...............................45, 47

*Henry v. S. Ohio Med. Ctr.*,
--- F.4th ----, No. 24-3863, 2025 WL 2621727
(6th Cir. Sept. 11, 2025) ...............................23, 39, 42

*Holly v. Clairson Indus., LLC*,
492 F.3d 1247 (11th Cir. 2007) ................................28

*Howard v. HMK Holdings, LLC*,
988 F.3d 1185 (9th Cir. 2021) .................................45

*Howe v. Mass. Dep't of Corr.*,
No. 4:22-cv-40119-MRG, 2024 WL 3536830
(D. Mass. July 25, 2024).............................................35

*Jackson v. King Cnty.*,
No. 2:23-CV-00774-RSL, 2025 WL 2022075
(W.D. Wash. July 18, 2025)......................................41

*Kizer v. St. Jude Children's Res. Hosp.*,
No. 24-5207, 2024 WL 4816856
(6th Cir. Nov. 18, 2024) ..........................23, 39, 42, 44

*Kluge v. Brownsburg Cmty. Sch. Corp.*,
64 F.4th 861 (7th Cir. 2023).....................................24

*Leake v. Raytheon Techs. Corp.*,
No. 23-15320, 2024 WL 1854287
(9th Cir. Apr. 29, 2024) ............................................28

*Lisoski v. King Cnty.*,
No. 2:23-CV-00536-RSL, 2025 WL 2511243
(W.D. Wash. Sept. 2, 2025) ......................................38

*Lujan v. Nat'l Wildlife Fed'n*,
497 U.S. 871 (1990) .................................................19

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986) .................................................20

*Melino v. Boston Med. Ctr.*,
127 F.4th 391 (1st Cir. 2025) ..................23, 32, 39, 42

*Miller v. Pt. Auth. of N.Y. & N.J.*,
788 F. App'x 886 (3d Cir. 2019)................................44

*Moran v. Selig*,
447 F.3d 748 (9th Cir. 2006) ....................................29

*Mumin v. City of N.Y.*,
760 F. Supp. 3d 28 (S.D.N.Y. 2024) .........................34

*O'Hailpin v. Hawaiian Airlines, Inc.*,
No. CV 22-00532 HG-WRP, 2025 WL 1543951
(D. Haw. May 30, 2025)............................................28

*Petersen v. Snohomish Reg'l Fire & Rescue*,
--- F.4th ----, No. 24-1044, 2025 WL 2503128
(9th Cir. Sept. 2, 2025) .....................................passim

*Peterson v. Hewlett-Packard Co.*,
358 F.3d 599 (9th Cir. 2004) .............................21, 45

*Rodriguez v. Robbins*,
803 F.3d 502 (9th Cir. 2015) ......................................5

*Rodrique v. Hearst Commc'ns, Inc.*,
126 F.4th 85 (1st Cir. 2025) ..............................passim

*Savel v. MetroHealth Sys.*,
   No. 24-4025, 2025 WL 1826674
   (6th Cir. July 2, 2025) ............................23, 29, 39, 42

*SEC v. Levine*,
   462 F. App'x 717 (9th Cir. 2011) ..............................35

*Slidewaters LLC v. Wash. Dep't of Labor & Indus.*,
   4 F.4th 747 (9th Cir. 2021)..........................................5

*Smith v. City of Atlantic City*,
   138 F.4th 759 (3d Cir. 2025) ...................................42

*Tiano v. Dillard Dep't Stores, Inc.*,
   139 F.3d 679 (9th Cir. 1998) ...................................18

*Trans World Airlines, Inc. v. Hardison*,
   432 U.S. 63 (1977) ..............................................24, 41

*United States Postal Serv. v. Ester*,
   836 F.3d 1189 (9th Cir. 2016) .................................20

*Varkonyi v. United Launch All., LLC*,
   No. 2:23-CV-00359-SB-MRW, 2024 WL 1677523
   (C.D. Cal. Feb. 21, 2024) ..........................................43

*Wise v. Child.'s Hosp. Med. Ctr. of Akron*,
   No. 24-3674, 2025 WL 1392209
   (6th Cir. May 14, 2025) ....................................passim

*Yott v. N. Am. Rockwell Corp.*,
   602 F.2d 904 (9th Cir. 1979) ...................................46

vii

**State Cases**

*Goodman v. Boeing,*
  899 P.2d 1265 (Wash. 1995).......................................54

*Kumar v. Gate Gourmet, Inc.,*
  325 P.3d 193 (Wash. 2014).........................................27

*Suarez v. State,*
  552 P.3d 786 (Wash. 2024).........................................26

**Federal Statutes**

28 U.S.C. § 1291 ...........................................................4

28 U.S.C. § 1331 ...........................................................4

28 U.S.C. § 1367(a).......................................................4

42 U.S.C. § 2000e-2 .................................................2, 20

**State Statutes**

Wash. Rev. Code § 49.60.180 ...................................2, 20

**Federal Rules**

Fed. R. Civ. P. 56(a) ....................................................22

Fed. R. Evid. 201(b)(2) .................................................6

**Other Authorities**

Proclamation 21-14 ......................................................7

## INTRODUCTION

This is one of many Title VII cases challenging the application of COVID-19 vaccine mandates adopted during an especially dangerous phase of the pandemic—the unprecedented rise in disease activity due to the virus's Delta variant in the summer of 2021. The Delta surge was uniquely challenging in the carceral setting, where prisons had to place severe restrictions on inmates' interactions and movement about the facilities and where COVID-19 outbreaks posed substantial health and safety risks to prisoners and employees alike.

Against this backdrop, Appellant Kevin Duden, who was employed by the Washington State Department of Corrections (DOC), requested a religious accommodation from a COVID-19 vaccination requirement for state agency employees. One of Duden's key roles was facilitating in-person classes for inmates in DOC's Aggression Replacement Training program in two of the highest security areas of the Washington State Penitentiary. Upon reviewing Duden's accommodation request, the essential functions of Duden's position, Duden's working environment, and the available medical and scientific data demonstrating unvaccinated persons' greater risk of spreading COVID-19, DOC determined that it could not accommodate Duden without jeopardizing the health and safety of others. He remained unvaccinated and thus legally ineligible to continue working for DOC, which accordingly terminated his employment.

1

Duden filed suit under Title VII of the Civil Rights Act of 1965 (Title VII), 42 U.S.C. § 2000e-2, and the Washington Law Against Discrimination (WLAD), Wash. Rev. Code § 49.60.180, claiming that those laws entitled him to an accommodation that would have allowed him to continue working at DOC unvaccinated. The District Court entered summary judgment for DOC, concluding that Duden's increased risk of transmitting COVID-19 as an unvaccinated employee whose job required close, in-person contact with others represented an undue hardship as a matter of law.

This decision reflects a broad and emerging consensus among federal courts, which have routinely granted summary judgment on undue hardship grounds where, the evidence showed, allowing unvaccinated plaintiffs to remain in their positions would endanger the health and safety of others. This has held true in a wide array of employment contexts—from firefighters to bus drivers to TV actors to NBA referees. The common thread has been the significant in-person contacts (with coworkers, patients, or others) the plaintiffs' jobs entailed. And *every* federal appellate court to review those decisions has affirmed summary judgment for the employer, including this Court. *See Petersen v. Snohomish Reg'l Fire & Rescue*, --- F.4th ----, No. 24-1044, 2025 WL 2503128 (9th Cir. Sept. 2, 2025); *infra* at 22–23.

This Court should affirm, too, because the same is true here. The undisputed evidence showed that accommodating Duden's religious

beliefs would have imposed an undue hardship on DOC. Specifically, the undisputed evidence demonstrated that (1) essential functions of Duden's correctional job—including the very nature of the Aggression Replacement Training Program—required him to work in close proximity to inmates and other DOC employees; (2) the authoritative public health guidance at the time of Duden's accommodation request was that vaccination was critical to stemming the spread of COVID-19; and (3) masking and testing had not resulted in the safe operations of DOC. Thus, allowing Duden to continue his in-person duties unvaccinated would have increased the risk of spreading COVID-19, which constitutes an undue hardship under this Court's precedents. And if Duden had worked remotely, DOC would have been forced to hire another person to facilitate the Aggression Replacement Training Program. This, too, would have imposed an undue hardship on DOC.

Although unnecessary to reach, the District Court's alternative holding was also correct: the undisputed evidence showed DOC had met its burden to initiate good faith efforts to accommodate Duden's religious beliefs. Indeed, DOC suggested a possible accommodation of reassignment, but Duden failed to fulfill his concomitant duty to cooperate in that process. This provides an independent basis to affirm the District Court.

## JURISDICTIONAL STATEMENT

Appellees agree that the District Court's judgment is final and that this Court has appellate jurisdiction under 28 U.S.C. § 1291. *See* Opening Br. at 6. Appellees further agree that Duden's Title VII claim vested the District Court with original, federal question jurisdiction pursuant to 28 U.S.C. § 1331. *See id.* at 5–6. This enabled the District Court to exercise supplemental jurisdiction over the state-law claim under the WLAD pursuant to 28 U.S.C. § 1367(a).

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1.  Where the essential functions of Duden's position required him to work in close contact with others, the medical and scientific evidence available at the time of Duden's accommodation request showed that vaccination reduced the risk of spreading COVID-19, masking and testing had not resulted in safe operations of DOC, and allowing Duden to work remotely would have required DOC to hire another person to fulfill his in-person duties, did the District Court correctly hold that accommodating Duden would have imposed an undue hardship on DOC?

2.  Where DOC suggested a possible accommodation but Duden failed to cooperate in the search for an acceptable reconciliation of his religious needs and the exigencies of DOC's business, did DOC meet its burden to initiate good faith efforts to accommodate Duden's religious practices?

4

## STATEMENT OF THE CASE

The below summary is based on the evidentiary record before the District Court on DOC's motion for summary judgment and judicially noticeable facts. *See Rodriguez v. Robbins*, 803 F.3d 502, 503 (9th Cir. 2015); Fed. R. Evid. 201(b)(2). DOC requests that this Court take judicial notice of the government records cited herein, including those from the U.S. Centers for Disease Control and Prevention (CDC) and the Washington State Department of Health (DOH).

### A. The COVID-19 Pandemic and Washington's Response

In February 2020, the United States received the first reports of COVID-19, SER-46, leading to the "deadliest" pandemic in "American history," *Florida v. Dep't of Health & Hum. Servs.*, 19 F.4th 1271, 1275 (11th Cir. 2021). In response to the emergency, "[g]overnments at all levels instituted restrictions to curb the transmission of the virus." *Slidewaters LLC v. Wash. Dep't of Labor & Indus.*, 4 F.4th 747, 752 (9th Cir. 2021). In Washington, then-Governor Jay Inslee proclaimed a state of emergency on February 29, 2020. SER-137.

The highly contagious virus spread quickly in Washington State. SER-137. During the early stages of the COVID-19 pandemic, health professionals and epidemiological modeling experts indicated that the spread of COVID-19, if left unchecked, threatened to overwhelm portions of Washington's public and private health-care system. SER-137. As such, Governor Inslee issued several subsequent proclamations

5

prohibiting certain activities, such as accessing nursing homes,[1] most public or social gatherings,[2] and residential evictions.[3] SER-137.

### B. COVID-19's Impact on DOC

Like Governor Inslee, upon hearing the reports of the spread of COVID-19, DOC moved quickly to quell the spread of the virus. SER-46. It implemented safety measures like masking, bi-weekly testing, daily symptom checks, and social distancing. SER-46.

The spread of the virus greatly affected the operations of the Washington State Penitentiary, a maximum security prison in Walla Walla. SER-46, SER-65. Specifically, the State Penitentiary had to place severe restrictions on the inmates' ability to interact and move about the facilities. SER-47. For example, prior to COVID-19, inmates—who are divided into cohorts—frequently interacted with other cohorts for recreation, meals, and other activities. SER-46. When COVID-19 struck, to reduce the virus's spread, the State Penitentiary had to implement processes like preventing the overlap of cohorts and requiring inmates to eat boxed meals in their individual cells. SER-47. Any outbreak in a

---

[1] Procl. by Gov. Jay Inslee No. 20-06 (Wash. Mar. 10, 2020), https://governor.wa.gov/sites/default/files/proclamations/20-06%20Coronavirus%20%28tmp%29.pdf.

[2] Procl. by Gov. Jay Inslee No. 20-13 (Wash. Mar. 16, 2020), https://governor.wa.gov/sites/default/files/proclamations/20-13%20Coronavirus%20Restaurants-Bars%20%28tmp%29.pdf.

[3] Procl. by Gov. Jay Inslee No. 20-19 (Wash. Mar. 18, 2020), https://governor.wa.gov/sites/default/files/proclamations/20-19%20-%20COVID-19%20Moratorium%20on%20Evictions%20%28tmp%29.pdf.

cohort required the entire living unit to be restricted and isolated or quarantined. SER-47. These restrictions caused tensions to rise among inmates. SER-47.

### C.    The Delta Surge and Proclamation 21-14

COVID-19 vaccines became available in December 2020. SER-138. The COVID-19 vaccines were safe and effective, having been evaluated in clinical trials involving tens of thousands of participants and meeting the U.S. Food & Drug Administration's (FDA) rigorous scientific standards for safety, effectiveness, and manufacturing quality. SER-138. However, as of August 4, 2021, 2.1 million eligible Washingtonians remained unvaccinated. SER-138.

In the summer of 2021, the highly contagious Delta variant became the dominant COVID-19 strain in the United States. SER-47; SER-138. Delta caused a massive spike in COVID-19 cases throughout Washington and within DOC specifically. SER-47; SER-138. Indeed, between June and July 2021, the positive cases among DOC staff increased more than two-and-a-half times. SER-47. And between July and August 2021, the positive cases tripled, jumping from 83 to 243. SER-47.

Faced with the unprecedented surge in COVID-19 cases, hospitalizations, and deaths, on August 9, 2021, Governor Inslee issued Proclamation 21-14 (the Proclamation) prohibiting healthcare providers and most state employees (and, subsequently, educators) from working after October 18, 2021, unless they received an exemption and

7

accommodation based on a medical condition or sincerely held religious belief. SER-47; SER-140–41.[4] The Proclamation applied to employees of DOC, as a state executive cabinet agency. SER-48.

### D. DOC's Exemption and Accommodation Process

DOC received close to 600 requests for religious accommodations from the Proclamation. SER-126. It implemented a three-step process for reviewing these requests. *See* SER-118–19.

First, employees requested an "exemption" by establishing that they had a sincerely held religious belief or medical condition precluding COVID-19 vaccination. SER-118. DOC had different forms for religious exemption requests and medical exemption requests. SER-118. The forms were typically submitted to the employee's local human resources (HR) department. SER-118. The local HR department would review the form to check for completeness, and if needed, seek additional information or clarification from the employee. SER-118–19.

Second, once the requests were complete, the local HR departments uploaded the requests into "OnBase," DOC's personnel management system, which then forwarded the requests to the DOC Exemption and

---

[4] Procl. by Gov. Jay Inslee No. 21-14 (Wash. Aug. 9, 2021), https://governor.wa.gov/sites/default/files/2023-01/21-14%20-%20COVID-19%20Vax%20Washington%20%28tmp%29.pdf; Procl. by Gov. Jay Inslee No. 21-14.1 (Wash. Aug. 20, 2021), https://governor.wa.gov/sites/default/files/2023-01/21-14.1%20-%20COVID-19%20Vax%20Washington%20Amendment.pdf.

Accommodation Team. SER-118. The Exemption and Accommodation Team reviewed the employee's specific job position and essential functions. SER-119.

Third, the Exemption and Accommodation Team met with then-HR Director Todd Dowler to review the requests and positions. SER-119. At this meeting, Dowler and the Exemption and Accommodation Team first determined if an employee was eligible for an exemption. SER-119. In the context of a religious exemption, this meant the employee had a "sincerely held religious belief that prevent[ed] [him] from being vaccinated from COVID-19." SER-120. DOC ultimately granted more than 500 religious exemptions. SER-126.

If an exemption was granted, Dowler and the team then determined whether the employee could be reasonably accommodated. SER-119. Possible accommodations included telework, leave, or reassignment. SER-126–27. There were approximately 30 vacant positions at DOC that were possible reassignment options. SER-126.

### E. Duden's Employment With DOC

Duden began working at the State Penitentiary in February 2018 as a Program Specialist 4. SER-65, SER-68. In July 2019, Duden's position was reallocated to Corrections Specialist 3 (CS3), which was his position at the time of the COVID-19 pandemic. SER-69; ER-55, ER-60. Duden's office had a door and a window next to open-air cubicles for other DOC staff. SER-86.

9

At the State Penitentiary, Duden worked in the Re-Entry Division, which was "responsible for the implementation of evidence-based practices and operational support" that were "designed to decrease recidivism, while increasing the safety of staff, participants, incarcerated individuals and the public." ER-60. The Re-Entry Division's objective was to "contribute to staff and community safety," "hold incarcerated individuals accountable by conducting appropriate screenings, assessments and evaluations to assess the risk and needs of the population," and to provide services "to ensure protection of staff, participant[s], incarcerated individuals, and the public." ER-60.

Duden's CS3 position contributed to the Re-Entry Division's "mission and vision" by "providing supervision, expertise, and technical assistance to ensure delivery of Cognitive Behavioral Interventions." ER-60. DOC's Cognitive Behavioral Interventions program was called Department of Corrections Aggression Replacement Training (DOCART). ER-60; SER-65–66.

As part of the DOCART program, Duden both facilitated classes for inmates and supervised a team that presented classes to inmates. SER-66. Duden worked with inmates in two of the highest security areas of the State Penitentiary—the West Complex, a maximum security unit, and the Intensive Management Unit South (IMU South), which housed inmates that engaged in violence and other rule violations. SER-66–67.

10

Thirty percent of Duden's job involved administering the DOCART program within the facility. ER-55.

The DOCART classes in the West Complex and IMU South met three days per week for 60 to 90 minutes in a classroom setting. SER-70–71. There was no internet connection in these classrooms because inmates were not allowed access to areas with phones or internet without supervision. SER-74, SER-5.

The West Complex classroom fit 10 desks and the IMU South classroom fit eight desks. SER-71. The inmates engaged in role-playing scenarios on social skills, problem solving, and moral reasoning. SER-71–72. In the West Complex, Duden sat at the head of the classroom and the inmates went to the front of the class to act out the scenarios. SER-72–73.

As the class facilitator, Duden was responsible for intervening in the scenarios when necessary, correcting behavior, providing feedback, and facilitating feedback from the inmates' peers in the group. SER-73. To accurately assess participation, Duden had to observe the body language of the participants. SER-76. Sometimes, the inmates would get into verbal or physical altercations in the classroom, and Duden was responsible for behavior intervention. SER-75, SER-77. Duden's supervisory role in the DOCART program involved monitoring attendance of facilitators, organizing groups, and observing and evaluating his team members' presentations. SER-78–79.

11

### F.     Duden's Accommodation Request

On September 3, 2021, Duden submitted a request for religious exemption and accommodation from the Proclamation. SER-147. The Exemption and Accommodation Team reviewed Duden's exemption request form and position description and approved his religious exemption. SER-48.

The team then considered whether Duden could be reasonably accommodated. SER-48. The team determined that the essential functions of Duden's job required him to provide in-person training to inmates through the DOCART program. SER-48. In fact, the very nature of the DOCART program necessitated in-person facilitation. SER-6. As such, no Cognitive Behavioral Intervention Programs were conducted remotely anywhere within DOC, and all the CS3s and Corrections Specialist 2s (CS2s) who facilitated classes did so in person. SER-5–6. Duden's supervisor concluded that Duden could not observe and interact with the inmates from behind a computer screen. SER-6.

Further, because inmates were not permitted to be left alone in areas with internet access, if Duden worked remotely, DOC would have had to hire another person to physically sit in the classroom to ensure that none of the inmates accessed the internet. SER-5. Moreover, if DOC had reassigned Duden's facilitator duties entirely, it would have had to reassign the administrative functions that flowed from the facilitator duties as well, such as making notes about how participants interacted,

12

how other staff members performed in facilitating the program, who attended, and other follow-up information. SER-6.

The Exemption and Accommodation Team next looked to medical and scientific evidence from the CDC and DOH, which showed that "COVID-19 is highly contagious and potentially fatal, especially to those who are unvaccinated." SER-155. CDC guidance also showed that the vaccines were "highly effective at protecting vaccinated people against symptomatic and severe COVID-19," and "[f]ully vaccinated people [were] less likely to become infected" and "less likely to get and spread SARS-COV-2." *Health Freedom Def. Fund., Inc. v. Carvalho*, 148 F.4th 1020, 1024 (9th Cir. 2025) (en banc) (citing *COVID: Interim Public Health Recommendations for Fully Vaccinated People*, CDC (July 28, 2021), https://perma.cc/AMW8-KH3Z).[5] As such, the CDC recommended that "everyone 5 years and older protect themselves from COVID-19 by

---

[5] In August 2021, the CDC explained: "[t]he Delta variant causes more infections and spreads faster than earlier forms of the virus that causes COVID-19," but "[v]accines continue to reduce a person's risk of contracting the virus that causes COVID-19, including this variant." CDC, *Benefits of Getting a COVID-19 Vaccine*, Aug. 16, 2021, https://perma.cc/9TQR-R7X4?type=image (web archive from Oct. 18, 2021). According to a September 2021 CDC report, unvaccinated people were five times more likely to contract, ten times more likely to be hospitalized with, and ten times more likely to die from COVID-19 than those who were fully vaccinated. CDC, *Monitoring Incidence of COVID-19 Cases, Hospitalizations, and Deaths, by Vaccination Status — 13 U.S. Jurisdictions, April 4–July 17, 2021* (Sept. 17, 2021), https://perma.cc/X7AF-ENCN.

getting fully vaccinated." *Id*. DOH similarly concluded that vaccination was critical to managing disease transmission. SER-155.

The team further considered whether masking, the use of personal protective equipment (PPE), distancing, and testing (collectively, "masking and testing") would be a possible accommodation. SER-49. DOC determined that it was not safe for Duden to continue in his position unvaccinated while masking and testing based on several considerations. SER-49. To begin, Washington State had issued guidelines to agencies like DOC, which stated that "safety measures in worksites that included PPE, distancing, testing, and other interventions were not stopping the spread of COVID-[1]9." SER-50; SER-53. Further, although DOC had been following masking and testing protocols, COVID-19 cases had skyrocketed in 2021. SER-49. And since the initial spread of the COVID-19 virus, four DOC employees had died from exposure to COVID-19 in the workplace. SER-49.

Additionally, a COVID-19 test could give a false negative or a false positive, and if a person was asymptomatic and had received a false negative, they could potentially spread COVID to others. SER-49. Moreover, to allow for distancing, the class sizes would have had to be reduced, which meant that fewer inmates could participate in the DOCART program. SER-84.

In sum, masking and testing were insufficient countermeasures by themselves to stem the spread of COVID-19, Duden's position required

14

close interactions with both other DOC staff and inmates, and the facts available demonstrated a significant risk of substantial harm by having someone present in the carceral environment who may be infected with COVID-19. SER-49. For those reasons, DOC determined that masking and testing would not enable Duden to safely continue in his position unvaccinated. SER-49.

## G. DOC's Denial of Duden's Accommodation Request

On September 21, 2021, Dowler sent Duden a letter informing him that DOC had determined he could not be accommodated in his position, because "[p]erforming [its] essential functions . . . pose[d] a threat to the health or safety" of Duden and others in the workplace. SER-155. Thus, "the only reasonable accommodation" DOC could offer was "the possibility of a reassignment." SER-156. Accordingly, the letter informed Duden that "[i]f [he] would like [DOC] to explore any available reassignment options," he should email "the DOCVACCINEEXEMPTIONS@DOC1.WA.GOV mailbox as soon as possible" along with his "most up-to-date resume." SER-156. The letter also invited Duden to "request a meeting with [Dowler] to discuss this decision." SER-156. The letter further stated, "[i]f you choose not to seek reassignment, or discuss other accommodation options, you are required to be fully vaccinated against COVID-19 no later than October 18, 2021 or you will be separated from employment." SER-156. If Duden decided to get vaccinated, however, he was eligible for a 45-day grace period—

15

using unpaid leave—to enable him to complete the primary vaccine series. SER-127–28.

Duden testified that he submitted a reassignment request by email, although there was no evidence in the record of that email. SER-90–91. And instead of setting up a meeting with Dowler, Duden emailed him three weeks later, on October 13, 2021, to "demand" that DOC "reconsider [his] situation" and "accommodate [his] religious beliefs" in his current position. SER-160. Specifically, Duden demanded that he either be allowed to work in his job while masking and testing or that DOC place him on paid administrative leave until DOC could "modif[y]" his duties so he could work from home "until the pandemic subside[d]." SER-161.

In response to Duden's email, DOC reviewed Duden's job classification, essential functions, and working environment for a second time to determine if an accommodation was possible. SER-98, SER-159. DOC replied to Duden that it was "not [ ] able to accommodate [him] in [his] current position" and that there was "no position[] [DOC] c[ould] assign [him] into at this time." SER-159. Reassignments at DOC were considered in order of seniority. SER-122. Thus, a DOC HR manager testified, if an employee applied for reassignment and a position was available but he "didn't receive a reassignment, it [meant it] would have gone to a higher [seniority] individual." SER-123.

16

Following DOC's response, Duden asked Dowler how to request a 45-day "grace period." SER-159. The 45-day grace period, however, was the period allowed for those who intended to get vaccinated but needed extra time beyond the deadline to complete the primary vaccine series. SER-127–28, SER-99. Duden had no intention of ever getting vaccinated. SER-99. Thus, this was not a possible accommodation.

Because Duden refused to receive the COVID-19 vaccine, his employment was terminated effective October 18, 2021. SER-100.

### H. Procedural History

Duden filed suit in state court on January 12, 2023. ER-4. Duden filed an Amended Complaint for Damages (Amended Complaint), against the State of Washington and DOC[6] (together, the State), alleging two failure-to-accommodate-religion claims—one under Title VII, 42 U.S.C. § 2000e-2(a), the other under WLAD, Wash. Rev. Code § 49.60.180. ER-12–19. The State timely removed the case. ER-3–7.[7]

---

[6] Duden's amended complaint also named as a Defendant the "Washington State Reformatory," describing it as a "correctional facility in Walla Walla County, Washington." ER-12; ER-13. This was presumably an error, as the Washington State Reformatory Unit is part of a separate DOC facility located in Monroe, Washington. *See* DOC, *Monroe Correctional Complex (MCC)*, https://doc.wa.gov/about-doc/locations/prison-facilities/monroe-correctional-complex-mcc (last visited Sept. 26, 2025); SER-185. Duden did not identify the Washington State Reformatory—nor any other subdivision of DOC—as a Defendant-Appellee in his notice of appeal. ER-75.

[7] Upon removal, the District Court dismissed the "fictitiously named" Defendants "John and Jane Does 1–10" from the case because "Doe

17

The District Court granted summary judgment to the State, holding that the undisputed evidence showed DOC "could not reasonably accommodate [Duden] because, despite good faith efforts to accommodate him, [Duden] did not engage in discussions with Defendant DOC, and Defendant DOC could not find a reasonable accommodation that did not result in undue hardship." ER-72–73 (citing *Tiano v. Dillard Dep't Stores, Inc.,* 139 F.3d 679, 681 (9th Cir. 1998)).

Specifically, the District Court held that Duden could not safely remain in his position unvaccinated while masking and testing because "COVID-19 was surging despite [these] protocols." ER-73. Duden worked in close proximity to inmates and in an office next to an open-air cubicle area, and thus would put both inmates and staff at risk of exposure to the virus. ER-73. Nor could Duden do his job remotely because his duties required in-person work where he managed a special inmate program in the maximum-security unit without access to internet for virtual coursework. ER-73. Additionally, Duden's request for paid administrative leave until the end of the pandemic was not reasonable because "[p]aying for an employee indefinitely would have resulted in undue hardship for [ ] DOC" where "the burden of granting the accommodation would have resulted in substantial increased costs," including to hire another employee qualified to work with high-risk

---

pleading" is not permitted in the Ninth Circuit. SER-207. Duden does not appeal this ruling. ER-75–76; Opening Br. at 6.

18

inmates and pay both salaries during an already challenging economic period for the State. ER-73 (citing *Groff v. DeJoy*, 600 U.S. 447, 468 (2023)).

In sum, because the State "evaluated reasonable accommodations," Duden "failed to engage in the interactive process," and the State "does not have to alter the functions of the job to satisfy an accommodation request under Title VII or WLAD," the District Court determined that the State was "entitled to judgment as a matter of law." ER-73.

## STANDARD OF REVIEW

This Court reviews the District Court's grant of summary judgment de novo and may affirm on any basis supported by the record. *Gordon v. Virtumundo, Inc.*, 575 F.3d 1040, 1047 (9th Cir. 2009). Summary judgment is appropriate when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In reviewing the record, the Court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). But "a District Court must resolve any factual issues of controversy in favor of the non-moving party only in the sense that, where the facts specifically averred by that party contradict facts specifically averred by the movant, the motion must be denied." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990) (cleaned up). For this reason, the nonmoving party must "'do more than simply show that

19

there is some metaphysical doubt as to the material facts.'" *United States Postal Serv. v. Ester*, 836 F.3d 1189, 1198 (9th Cir. 2016) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

## SUMMARY OF ARGUMENT

The District Court's summary judgment order should be affirmed as to Duden's failure-to-accommodate-religion claims under Title VII and WLAD.

First, the District Court correctly held that accommodating Duden would have been an undue hardship. The District Court's ruling is supported by undisputed evidence that Duden's position required him to work in close contact to inmates and other DOC staff, that vaccination was critical to managing the spread of COVID-19 by reducing the risk of a person spreading COVID-19, that masking and testing had not resulted in safe operations within DOC, and that allowing Duden to work remotely would have required DOC to hire or assign another individual to take over his in-person duties.

Second, while unnecessary to reach because the State proved undue hardship, the District Court was also correct in holding that the State met its burden to initiate good faith efforts to accommodate Duden's religious beliefs. The District Court's ruling is supported by undisputed evidence that DOC suggested a possible accommodation, and Duden failed to fulfill his concomitant duty to cooperate.

20

## ARGUMENT

The District Court correctly granted summary judgment on Duden's Title VII and WLAD claims. To establish a prima facie case of failure to accommodate religion under Title VII, a plaintiff has the burden to show:

> (1) he had a bona fide religious belief, the practice of which conflicts with an employment duty; (2) he informed his employer of the belief and the conflict; and (3) the employer discharged, threatened, or otherwise subjected him to an adverse employment action because of his inability to fulfill the job requirement.

*Petersen v. Snohomish Reg'l Fire & Rescue*, --- F.4th ----, No. 24-1044, 2025 WL 2503128, at *4 (9th Cir. Sept. 2, 2025) (quoting *Peterson v. Hewlett-Packard Co.*, 358 F.3d 599, 606 (9th Cir. 2004)). If the "plaintiff makes out a prima facie failure-to-accommodate case, the burden then shifts to the employer to show that it initiated good faith efforts to accommodate reasonably the employee's religious practices *or* that it could not reasonably accommodate the employee without undue hardship." *Id.* (emphasis added) (cleaned up). Because the failure-to-accommodate-religion standards under the WLAD "mirror[] the federal" Title VII standard, the State addresses those claims together, using "Title VII" to refer to both statutes. *Id.* n.3; *see Suarez v. State*, 552 P.3d 786, 795 (Wash. 2024); *Kumar v. Gate Gourmet, Inc.*, 325 P.3d 193, 203 (Wash. 2014).

21

Here, the District Court determined that Duden established a prima facie case of failure to accommodate religion under Title VII, which the State had not contested. ER-72. But the District Court also correctly determined that the State satisfied its burden to demonstrate that: (1) it could not reasonably accommodate Duden without undue hardship; and (2) it had initiated good faith efforts to accommodate Duden's religious practices, but Duden failed to reciprocate. ER-73. Therefore, Duden's Title VII claim failed as a matter of law.

## I. Accommodating Duden Would Have Caused DOC Undue Hardship

### A. Title VII's Undue Hardship Standard

An "'undue hardship' is shown when a burden is substantial in the overall context of an employer's business." *Groff*, 600 U.S. at 468. In assessing undue hardship, a court "must apply the test in a manner that takes into account all relevant factors in the case at hand, including the particular accommodations at issue and their practical impact," and "in the common-sense manner that it would use in applying any such test." *Id.* at 470–71. Three basic undue hardship principles are particularly relevant here:

*First*, an accommodation that poses legitimate safety concerns, including the spread of infectious diseases like COVID-19, constitutes undue hardship. *See Petersen*, 2025 WL 2503128, at *7. Consistent with that principle, every circuit to consider the issue in the COVID-19 vaccine

context—including this Court—has affirmed summary judgment on undue hardship based on the unvaccinated employee's risk of spreading the virus. *See, e.g.*, *id.*; *Henry v. S. Ohio Med. Ctr.*, --- F.4th ----, No. 24-3863, 2025 WL 2621727, at *8 (6th Cir. Sept. 11, 2025); *Melino v. Boston Med. Ctr.*, 127 F.4th 391, 397–98 (1st Cir. 2025); *Rodrique v. Hearst Commc'ns, Inc.*, 126 F.4th 85, 92–93 (1st Cir. 2025); *Savel v. MetroHealth Sys.*, No. 24-4025, 2025 WL 1826674, at *2 (6th Cir. July 2, 2025); *Wise v. Child.'s Hosp. Med. Ctr. of Akron*, No. 24-3674, 2025 WL 1392209, at *5 (6th Cir. May 14, 2025); *Bushra v. Main Line Health, Inc.*, No. 24-1117, 2025 WL 1078135, at *2 (3d Cir. Apr. 10, 2025); *Kizer v. St. Jude Children's Res. Hosp.*, No. 24-5207, 2024 WL 4816856, at *5 (6th Cir. Nov. 18, 2024).

**Second**, the "relevant [undue hardship] inquiry" must be "cabined" to the "medical and scientific evidence available at the time [the employer] made [its] decision." *Rodrique*, 126 F.4th at 92 (citing *Bragdon v. Abbott*, 524 U.S. 624, 653 (1998)) (cleaned up). In the vaccine context, then, an employer must "demonstrate that it looked to the objective medical evidence available to it in the fall of 2021 in reasonably concluding that the vaccine reduces the likelihood of transmitting COVID-19, and that therefore granting [the employee] an exemption would have caused it undue hardship." *Id.*; *see also Peterson*, 2025 WL 2503128, at *9 ("We must consider the costs faced by [the employer] in October 2021, not today," including "the scientific evidence and COVID

23

data then available . . . ."); *Kluge v. Brownsburg Cmty. Sch. Corp.*, 64 F.4th 861, 888 (7th Cir. 2023), v*acated on other grounds*, No. 21-2475, 2023 WL 4842324 (7th Cir. July 28, 2023) ("To suggest that the employer may be held liable for a decision to withdraw an accommodation based on information that did not exist at the time of the decision holds employers to an impossible 'crystal ball' standard.").

***Third***, the undue hardship analysis must account for the "cumulative cost or burden of granting accommodations to other employees" who requested them. EEOC, *What You Should Know about COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws*, § L.4 (updated Mar. 1, 2022), https://perma.cc/CQ9C-JPNY; *see, e.g.*, *Petersen*, 2025 WL 2503128, at *7–8; *Wise*, 2025 WL 1392209, at *5 (affirming summary judgment where "at least 35 other employees had requested the same religious exemption as Plaintiff, which would have 'exponentially increased' the risk of spreading the virus . . . ."); *see also Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 84 n.15 (1977).

These three principles undergird the District Court's correct conclusion that accommodating Duden would have imposed an undue hardship on DOC. The State presented unrebutted evidence on the safety risks posed by Duden on inmates and staff. ER-55; SER-66–67; SER-71; SER-155. The State undisputedly relied on the authoritative scientific evidence available in fall 2021 when making its decision. SER-155. And accommodating not only Duden but all 500 DOC employees who were

24

granted exemptions would have compounded the costs DOC would have had to incur by orders of magnitude. SER-5–6, SER-126.

**B.    Under *Petersen*, Duden's Increased Risk of Spreading COVID-19 Constitutes an Undue Hardship**

The District Court correctly determined that Duden's "duties required in-person work because he managed a special inmate program in a maximum-security unit without access to internet" and his "close proximity" to inmates and staff increased the risk of their exposure to COVID-19, which constituted an undue hardship. ER-73. No competent evidence contradicted this fact, which established undue hardship as a matter of law, as confirmed by this Court's recent decision in *Petersen*.

In *Petersen*, unvaccinated firefighters with Snohomish Regional Fire and Rescue (SRFR) sued based on SRFR's denial of their requests for religious accommodations from the Proclamation. 2025 WL 2503128, at *1. The district court granted summary judgment on undue hardship because "the undisputed evidence showed that 'allowing unvaccinated firefighters to work would increase the risk of spreading COVID-19.'" *Id.* at *3. This Court affirmed in a published opinion that strongly supports affirmance here based on the State's undue hardship defense.

Here, like in *Petersen*, the undisputed evidence showed that allowing Duden to work unvaccinated would have increased the risk of spreading COVID-19. Specifically, the unrebutted evidence showed that: (1) the essential functions of Duden's position required him to have close

25

contact with others; (2) the available scientific data showed vaccination was critical to stemming the spread of COVID-19 by reducing a person's risk of transmission; and (3) masking and testing had not resulted in safe operations within DOC.

### 1. The essential functions of Duden's position required him to have close contact with others

In *Petersen*, the record showed that "firefighters work in group settings, interfacing constantly with coworkers and the public, both inside, and outdoors." *Id.* at *7 ("[W]hen considering undue hardship in the context of COVID, employers should consider if the employee 'works in a solitary or group work setting,' 'has close contact with other employees or members of the public,' and 'works outdoors or indoors.'") (quoting *What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws*, EEOC (Mar. 1, 2022), https://perma.cc/CQ9C-JPNY); *see also Wise*, 2025 WL 1392209, at *3 (noting that the "general concerns regarding COVID-19 are more acute when viewed in the context of Plaintiff's specific role at the hospital" where she "was exposed to up to 27 pharmacy employees each ten-hour shift, some of whom also worked on the hospital's patient floors").

Similarly here, the undisputed evidence demonstrated that the essential functions of Duden's position required him to have close contact with inmates and his co-workers. Indeed, thirty percent of Duden's job involved administering the DOCART program, which required

26

facilitating classes in a classroom setting in two of the highest security areas of the State Penitentiary. ER-55; SER-66–67; SER-71. Duden sat at the head of the classroom as inmates acted out scenarios in front of the class. SER-72–73. As the class facilitator, Duden was responsible for intervening in the scenarios when necessary, correcting behavior, providing feedback, and facilitating feedback from the other inmates in the group. SER-73. Duden also had to observe participants' body language to assess participation and intervene if the inmates got off track. SER-76–77. Duden's supervisory role similarly required Duden to work in person so that he could observe and evaluate his team members as they presented, organize groups, and monitor attendance. SER-78–79.

Duden argues that the State "did not state why they eliminated" the possibility of his working remotely. Opening Br. at 13. But the undisputed evidence showed that the very nature of the DOCART program required in-person facilitation. SER-6. Duden's supervisor testified that Duden could not observe behavior or body language and interact with the inmates from behind a computer screen. SER-6. Further, inmates were not permitted to be left alone in areas where there was internet access. SER-5. Thus, if Duden had worked remotely, DOC would have had to hire another person to physically sit in the classroom to ensure that none of the inmates accessed the internet. SER-5. Nothing in the record contradicts that evidence, which Duden ignores in his Opening Brief.

27

Duden further contends that some DOC employees "were allowed to perform their jobs virtually or had their duties suspended," as "Duden stated in his deposition." Opening Br. at 15. This argument is unavailing for two reasons. First, Duden does not explain how those other employees are even theoretically relevant to whether DOC could safely accommodate *him*. Such "comparator" evidence is part of "traditional" disparate treatment claims, not failure-to-accommodate claims. *See, e.g.*, *Leake v. Raytheon Techs. Corp.*, No. 23-15320, 2024 WL 1854287, at *1 (9th Cir. Apr. 29, 2024) (affirming dismissal of disparate treatment claim because no "non-religious employees . . . declined to comply with the vaccination requirement" but "were not subject to the adverse consequences that Plaintiffs allege"). Duden provides no principled basis for grafting the comparator prong of the disparate treatment prima facie case onto the undue hardship defense to failure-to-accommodate claims. *Cf. EEOC v. TriCore Reference Labs.*, 849 F.3d 929, 941 (10th Cir. 2017) (explaining role of comparator evidence in disparate treatment cases).[8]

---

[8] Other courts have recognized that "[c]omparator evidence has no role whatsoever in a failure to accommodate claim." *Green v. United Parcel Serv., Inc.*, No. CV 18-8744, 2019 WL 1430244, at *1, n.2 (E.D. La. Mar. 29, 2019); *see, e.g.*, *Holly v. Clairson Indus., LLC*, 492 F.3d 1247, 1263 (11th Cir. 2007); *O'Hailpin v. Hawaiian Airlines, Inc.*, No. CV 22-00532 HG-WRP, 2025 WL 1543951, at *2 (D. Haw. May 30, 2025); *Chavez v. S.F. Bay Area Rapid Transit Dist.*, No. C 22-06119 WHA, 2024 WL 4371002, at *5 (N.D. Cal. Oct. 1, 2024).

Second, even if comparator evidence were relevant to undue hardship, Duden identifies no "similarly situated" employee whom DOC accommodated. *See Moran v. Selig*, 447 F.3d 748, 755 (9th Cir. 2006) (comparator must be similarly situated to plaintiff in "all material respects"). Duden confirmed in his deposition that he had no personal knowledge of any accommodations other employees received or their specific circumstances. SER-92–97. And the "hearing officers" Duden identified as having worked remotely "when the pandemic started" conducted *one-on-one* hearings with incarcerated individuals. Opening Br. at 19; SER-7. Unlike such hearings, the undisputed evidence showed that the cognitive behavioral interventions Duden conducted in a classroom setting with violent offenders could *not* be done remotely. SER-6. Indeed, no cognitive behavioral intervention programs were conducted remotely anywhere within DOC. SER-6. And all the CS3s and CS2s who facilitated the program did so in person. SER-5–6.

In sum, Duden failed to identify any employee similarly situated to *him* in all material respects who was allowed to work remotely. Thus, his argument that "unnamed employees received unidentified accommodations" does not undermine the District Court's undue hardship ruling. *Bushra*, 2025 WL 1078135, at *2 ("without any information on other employees granted accommodations, we cannot reasonably infer that [the employer] accommodated *similarly situated* staff") (emphasis added) (cleaned up); *see also Savel*, 2025 WL 1826674,

29

at \*3 (affirming summary judgment on disparate treatment claim because plaintiff did not "identify a similarly situated employee—like an in-person ICU nurse or doctor—who received a medical exemption when he was denied a religious one"); *Dixon v. Bessent*, No. 24-5110, 2025 WL 1720742, at \*3 (D.C. Cir. June 20, 2025) (per curiam) (affirming Rule 12(b)(6) dismissal of disparate treatment claim where plaintiff made "no plausible allegations that employees who were permitted to work remotely were situated similarly to her," as "[n]othing in the complaint suggests any staff members who received remote-work approval were situated similarly to Dixon, or even that they did not share her faith").

### 2. The available scientific data showed vaccination was critical to managing the spread of COVID-19

In *Petersen*, the Court relied on the "extensive declaration of Dr. John Lynch" a "board-certified physician in infectious disease." 2025 WL 2503128, at \*6. The expert's findings established that "SRFR would have faced significant health and safety costs by allowing unvaccinated firefighters to continue working, even with accommodations." *Id.* at \*7. The findings also included that "COVID vaccination is the best way to slow the spread of COVID and prevent serious illness or death;" "being fully vaccinated provides better protection [from reinfection] as compared to having recovered from COVID;" and "[d]uring th[e] time [of the vaccination mandate], 'cases were spiking due to the Delta variant despite other strategies in place.

30

This was followed by the Omicron waves, which continued . . . into 2022.'" *Id.* at \*6.

While the record before this Court does not include an expert report, an employer does not need to *prove* that vaccinated workers were less likely to transmit the virus in the workplace to prove undue hardship on the basis of an increased risk of transmitting the virus. *See Rodrique*, 126 F.4th at 92. Rather, as the First Circuit held in *Rodrique*—which also involved no expert testimony and which *Petersen* cited favorably, *see* 2025 WL 2503128, at \*10—the employer must show that it "reasonably relied on [the] objective medical evidence" available "when it set its vaccine policy." *Rodrique*, 126 F.4th at 92 (cleaned up); *see also Peterson*, 2025 WL 2503128, at \*9 ("We must consider the costs faced by [the employer] in October 2021, not today," including "the scientific evidence and COVID data then available . . . ."). In other words, the employer must "demonstrate that it looked to the objective medical evidence available to it in the fall of 2021 in reasonably concluding that the vaccine reduces the likelihood of transmitting COVID-19, and that therefore granting [the employee] an accommodation would have caused it undue hardship." *Rodrique*, 126 F.4th at 92; *see also Petersen*, 2025 WL 2503128, at \*9 ("The pandemic forced the State of Washington to make decisions quickly and with limited information. In so doing, SRFR relied on the scientific evidence and COVID data then available and acted in the best interests of the community.").

31

Here, the State met this burden. Indeed, DOC relied "on the objective, scientific information available to [it]," with particular attention to "the views of public health authorities" like CDC and DOH. *Rodrique*, 126 F.4th at 91; SER-155. Based on that objective evidence, DOH determined that "a significant risk of harm [was] posed by having someone present in the workplace who may be infected with COVID-19, with or without symptoms." SER-155; *see also Petersen*, 2025 WL 2503128, at *10 ("The First Circuit had little difficulty concluding [in *Melino*, 127 F.4th 391,] that 'permitting Melino to work unvaccinated would pose an undue hardship by increasing the risk of COVID-19 transmission amongst staff and patients,' noting that it was 'uncontroverted that [the hospital] implemented its vaccine requirement based on the CDC's recommendations.'") (quoting *Melino*, 127 F.4th at 397).

As in *Rodrique*, here "no medical evidence in the summary judgment record contradicts [DOC's] conclusion that vaccinated people are less likely to infect others." 126 F.4th at 93. To the contrary, the "objective and scientific information" available in the fall of 2021 showed that the COVID-19 vaccines were "highly effective at protecting vaccinated people against symptomatic and severe COVID-19," and "[f]ully vaccinated people [were] less likely to become infected" and "less likely to get and spread SARS-COV-2." *Carvalho*, 148 F.4th at 1024. The CDC director reiterated that COVID-19 vaccines prevented "severe

32

illness and death." *Id.* at 1024 (citing Madeline Holcombe & Christina Maxouris, *Fully Vaccinated People Who Get a Covid-19 Breakthrough Infection Can Transmit the Virus*, CDC Chief Says, CNN Health (Aug. 6, 2021), https://perma.cc/Z5RV-UPLR). Other experts urged that "[g]etting more people vaccinated . . . w[ould] help prevent other—potentially even more aggressive—variants from arising in the future." *Id.* And a former CDC director explained that "outbreaks . . . w[ould] not be as explosive in areas with higher vaccination coverage." *Id.* Even later in 2021, the CDC reported that "[v]accines remain the best public health measure to protect people from COVID-19, slow transmission, and reduce the likelihood of new-variants emerging." *Id.* (citing *Omicron Variant: What You Need to Know*, CDC (Dec, 9, 2021), https://stacks.cdc.gov/view/cdc/112430 [https://perma.cc/B4EG-5QMR]). As such, the CDC recommended that "everyone 5 years and older protect themselves from COVID-19 by getting fully vaccinated." *Id.*

In *Petersen*, the Court also considered why managing the spread of COVID-19 was important for firefighters specifically. 2025 WL 2503128, at *6. For example, unvaccinated firefighters might endanger the public when they "have to enter public buildings or private residences" and when they "transport injured or sick persons in their vehicles." *Id.* These interactions brought an "infected firefighter into proximity to an often higher-risk patient population" which risked infecting that population. *Id.*

33

DOC, too, considered that managing the spread of COVID-19 was especially important in the congregate setting of the State Penitentiary. SER-47. Earlier in the pandemic, DOC had to place severe restrictions on inmates' ability to interact and move about the facility. SER-47. For example, cohorts could not overlap as they usually did, and inmates had to eat in their individual cells, rather than eating with other inmates. SER-46–47. Any cohort outbreak required the entire living unit to be isolated or quarantined. SER-47. These restrictions on inmates caused tensions to rise among inmates. SER-47.

These health and safety concerns unique to the carceral setting further support undue hardship here, as various courts have recognized. *See, e.g.*, *Andrade v. Mass. Dep't of Corr.*, No. 22-11899-FDS, 2025 WL 319563, at *4–6 (D. Mass. Jan. 13, 2025), *appeal docketed*, No. 25-1094 (1st Cir.) (granting summary judgment on undue hardship where "prisoners exposed to the virus had to isolate in restricted areas of defendant's facilities, curtailing the rehabilitative programs overseen by the correctional program officers and forcing the agency to make changes to its staffing assignments" and "outbreaks of COVID-19 in correctional facilities pose[d] substantial health and safety risks to the prisoners, who are there involuntarily and cannot isolate themselves").[9]

---

[9] *See also Mumin v. City of N.Y.*, 760 F. Supp. 3d 28, 47 (S.D.N.Y. 2024) (dismissing Title VII claim based on undue hardship, citing "the unique threats that COVID-19 posed to the DOC, the deaths of service members, and the difficulties the DOC had been experiencing in staffing jail

Duden argues that the State did "nothing to address the threat to the health or safety of the vaccinated employees and others in the workplace against the danger of vaccinated people transmitting the virus to others." Opening Br. at 22. However, Duden did not present this argument at the District Court, and thus it is forfeited on appeal. *See SEC v. Levine*, 462 F. App'x 717, 718–19 (9th Cir. 2011).

But even if the Court were to consider Duden's new argument, it would fail because the study Duden cites concluded that the vaccines *did* provide protection against infection from both the Omicron and Delta variants. *See* Opening Br. at 22 (citing Christian Holm Hansen, et al., *Vaccine effectiveness against SARS-CoV-2 infection with the Omicron or Delta variants following a two-dose or booster BNT 162b2 or mRNA-1273 vaccination series: A Danish cohort study*, (Dec. 22, 2021), https://www.medrxiv.org/content/10.1101/2021.12.20.21267966v2.full-text). While vaccinated individuals could still be infected, the undisputed evidence in the District Court showed that unvaccinated individuals were at a *higher* risk of contracting and transmitting the virus. SER-155;

---

facilities"); *Howe v. Mass. Dep't of Corr.*, No. 4:22-cv-40119-MRG, 2024 WL 3536830, at *6 (D. Mass. July 25, 2024) (granting summary judgment on undue hardship where "social distancing [was] impractical in [plaintiff's] role due to the requisite close contact with inmates and coworkers" and the "risk of disease transmission [was] particularly high in a confined, maximum security prison environment where many inmates have preexisting health conditions, such as Hepatitis C from previous drug use.").

35

*Carvalho*, 148 F.4th at 1024. Duden provides no authority to show that the State had to prove that the vaccines eliminated *all* risk to meet their burden to show undue hardship. *See* Opening Br. at 22–23; *see also Petersen*, 2025 WL 2503128, at \*9 ("An undue hardship may include an evaluation of the risk of hardship, not just an accounting of damages actually suffered.").

### 3. The unrebutted evidence showed that masking and testing alone were inadequate

In *Petersen*, the Court held that the plaintiffs' proposed accommodations—testing, masking, and social distancing in lieu of vaccination—were insufficient to mitigate the risk of unvaccinated firefighters spreading COVID-19. 2025 WL 2503128, at \*7. Specifically, COVID-19 testing was "not sufficient" because tests were not always accurate and "unvaccinated people subject to testing were 'among positive cases that . . . caused outbreaks in' Washington." *Id*. Further, Dr. Lynch "described PPE, like masks, as 'complements, not substitutes, for getting vaccinated,' since '[m]asks shore up protection on the outside,' and vaccines do so on the 'inside.'" *Id*.; *see also Bushra*, 2025 WL 1078135, at \*2 (affirming summary judgment on undue hardship where, inter alia, the evidence showed "that alternative infection control strategies, such as frequent testing and masking, were not sufficient to prevent transmission").

Similarly here, Duden requested that he be allowed to continue working using masking and testing. SER-161. But the undisputed evidence in the record showed that masking and testing were not effective at stemming the spread of the virus at DOC. Indeed, the State had issued guidelines to agencies like DOC, which stated that "safety measures in worksites that included PPE, distancing, testing, and other interventions were not stopping the spread of COVID-[1]9." SER-50; SER-53. Further, a COVID-19 test could give a false negative or a false positive, thus if a person was asymptomatic and had received a false negative, they could potentially spread COVID to others. SER-49. And although DOC had been following masking and testing protocols, COVID-19 cases had skyrocketed in 2021. SER-49. Between June and July 2021, the positive cases among DOC staff increased more than two-and-a-half times. SER-47. And between July and August 2021, the positive cases had tripled, jumping from 83 to 243. SER-47. Moreover, since the initial spread of the COVID-19 virus, four DOC employees died from exposure to COVID-19 in the workplace. SER-49. Thus, like in *Petersen*, the record undisputedly established that masking and testing were inadequate. 2025 WL 2503128, at *7.

Duden contends that OSHA had provided guidelines to employers that recommended masking and testing regardless of vaccination status. Opening Br. at 20 (citing OSHA, *Protecting Workers: Guidance on Mitigating and Preventing the Spread of COVID-19 in the Workplace*

37

(updated June 10, 2021), https://www.osha.gov/coronavirus/safework). But Duden's reliance on the OSHA guidance is flawed. While the guidance recommended masking and testing, it "emphasize[d] that vaccination is the most effective way to protect against severe illness or death from COVID-19" and suggested that "employers consider adopting policies that require workers to get vaccinated." OSHA, *Protecting Workers Guidance on Mitigating and Preventing the Spread of COVID-19 in the Workplace, supra.*

Duden further argues that courts have "not consistently" held that an unvaccinated employee risking the health and safety of other employees or individuals is an undue hardship, citing a single case. Opening Br. at 20 (citing *Doe 1 v. NorthShore Univ. HealthSystem* (*NorthShore*), No. 21-cv-05683, 2021 WL 5578790, at *5 (N.D. Ill. Nov. 30, 2021)). He is mistaken. As one court recently noted, "[a]lmost every court to consider the matter . . . agrees that an accommodation which poses a significant health or safety risk to co-workers or customers constitutes an undue hardship for purposes of a failure-to-accommodate claim." *Lisoski v. King Cnty.*, No. 2:23-CV-00536-RSL, 2025 WL 2511243, at *5 (W.D. Wash. Sept. 2, 2025).

Even the one case Duden cites does not support his position. In *NorthShore*, the court considered the plaintiffs' Title VII claim in the context of a motion for preliminary injunction (which it denied). 2021 WL 5578790, at *1. No discovery had occurred and "complex and significant

38

factual issues [had] been presented under a tightly compressed timeframe." *Id.* at *5. The limited record showed that the hospital employer had initially allowed employees who sought exemptions to continue doing their jobs with masking and testing and then "abrupt[ly]" changed its policy with "little justification." *Id.* at *2, 5. Based on this limited record, the court held that, "[a]t this preliminary stage, it is by no means settled that NorthShore has done all it can to reasonably accommodate Plaintiffs." *Id.* at *5.

Unlike in *NorthShore*, the District Court had the benefit of a robust factual record assembled after the parties completed discovery. As explained above, the undisputed facts show that DOC considered the available public health data and guidance to determine that a significant risk of harm was posed by the presence in the workplace of someone who may be infected with COVID-19, with or without symptoms, and that vaccination was critical to stemming the spread of COVID-19. SER-155. Moreover, the data and guidance showed that masking and testing protocols were not effective. SER-49–50, SER-53. As such, unlike *NorthShore*, Duden's increased risk of contracting and transmitting COVID-19 was undisputed as a matter of fact, and that risk represented an undue hardship to DOC as a matter of law. *See Petersen*, 2025 WL 2503128, at *7; *see also Henry*, 2025 WL 2621727, at *8; *Melino*, 127 F.4th at 397–98; *Rodrique*, 126 F.4th at 92–93; *Savel,* 2025 WL 1826674, at *2; *Wise*, 2025 WL 1392209, at *5; *Bushra*, 2025 WL 1078135, at *2; *Kizer*,

2024 WL 4816856, at *5. For this reason alone, this Court should affirm summary judgment as to Duden's failure-to-accommodate-religion claims.

### C. Duden's Working Remotely or Taking Paid Leave Would Have Imposed an Undue Hardship on DOC

The District Court correctly determined that Duden could not work remotely or be placed on paid administrative leave without causing DOC undue hardship. ER-73. As explained above, Duden's in-person presence within classrooms was of paramount value to effectively facilitating the DOCART program. *See supra* at 26–27. Accordingly, DOC would have faced a significant burden and undue hardship by allowing Duden to facilitate the program remotely because he would have been unable to intervene and observe body language to gauge participation. *Groff*, 600 U.S. at 468 (instructing courts to consider the nature of an employer's business when assessing whether an undue hardship exists); *Beickert v. N.Y.C. Dep't of Educ.*, No. 22-CV-5265(DLI)(VMS), 2023 WL 6214236, at *6 (E.D.N.Y. Sept. 25, 2023) (holding that accommodating special education teacher would have resulted in undue hardship where her "in-person presence . . . would have been of paramount value and importance to effectively teach and attend to the individualized needs of her special needs students," and thus the employer "would face a significant burden and undue hardship by allowing [plaintiff] to teach special education students remotely when in-person attendance had resumed because the

40

particularized educational needs of her special needs students would be neglected").

Moreover, if Duden had worked remotely or been placed on leave, DOC would have been required to hire or assign another person to monitor the inmates' internet use, or to take over the facilitation duties completely, along with the associated administrative functions. SER-5–6. This, too, would have caused an undue burden and hardship on DOC. *See, e.g.*, *Adams v. Retail Ventures, Inc.*, 325 F. App'x 440, 443 (7th Cir. 2009) (affirming entry of summary judgment on undue hardship grounds where accommodating plaintiff would have either left store short a cashier, resulting in lost efficiency, or forced it to hire another one, incurring extra cost); *Cooper v. Oak Rubber Co.*, 15 F.3d 1375, 1380 (6th Cir. 1994) (affirming judgment after bench trial based on undue hardship where employer would have had to hire an additional worker or risk the loss of production).

Further, approximately 600 DOC employees submitted religious exemption requests, of which DOC approved 500. SER-126. The cumulative cost of granting similar accommodations like paid leave to not only Duden but these other individuals as well would have imposed undue hardship on the State. *See* EEOC, *What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws* § L.4; *Wise*, 2025 WL 1392209, at *5; *Hardison*, 432 U.S. at 84 n.15; *see, e.g.*, *Jackson v. King Cnty.*, No. 2:23-CV-00774-RSL, 2025 WL 2022075,

41

at *6 (W.D. Wash. July 18, 2025) (entering summary judgment on undue hardship where the plaintiff, "along with the other 114 transit operators who requested a religious exemption," could not "be reassigned or put on paid leave without substantial costs").

For all these reasons, Duden's accommodation request to work remotely or be placed on paid administrative leave would have imposed an undue hardship on the State.

### D.   The State Does Not Need to Provide Cost Data to Prove Undue Hardship Under Title VII

Duden argues that the State failed to prove that accommodating him would have imposed an undue hardship under *Groff* because it "provided no cost data." Opening Br. at 13. But courts post-*Groff* have rejected the economic-only analysis. *See Smith v. City of Atlantic City*, 138 F.4th 759, 774 (3d Cir. 2025) ("Post-*Groff*, we may still evaluate both economic and non-economic costs as a source of undue hardship.") (cleaned up). Indeed, Duden ignores all of the appellate decisions post-*Groff* that have affirmed entry of summary judgment on undue hardship grounds based on the unvaccinated employee's risk of spreading the virus to coworkers, customers, members of the public, and others. *See Petersen*, 2025 WL 2503128, at *7; *Henry*, 2025 WL 2621727, at *8; *Melino*, 127 F.4th at 397–98; *Rodrique*, 126 F.4th at 92–93; *Savel*, No. 24-4025, 2025 WL 1826674, at *2; *Wise*, 2025 WL 1392209, at *5; *Bushra*, 2025 WL 1078135, at *2; *Kizer*, 2024 WL 4816856, at *5.

Instead, Duden cites a single district court decision. Op. Br. at 12–13 (citing *Varkonyi v. United Launch All., LLC*, No. 2:23-CV-00359-SB-MRW, 2024 WL 1677523 (C.D. Cal. Feb. 21, 2024)). But *Varkonyi* did not hold that an employer must always calculate economic costs to meet its burden to show undue hardship. Rather, after the employer received 109 accommodation requests, it denied them because implementing a COVID-19 testing system for all employees would have cost at least $25,000. 2024 WL 1677523, at *2. The court determined that this cost estimate was not tailored to the hardship that would result from accommodating the plaintiff—either in isolation or together with the other requests. *Id.* at *6.

Unlike in *Varkonyi*, DOC did not deny all religious accommodation requests en masse based on the costs of accommodating all employees. Rather, it implemented a three-step process in which it reviewed the individual requests and the specific job position for the employee to determine if the request met the requirements for an exemption, and if so, whether there was an accommodation available. SER-118–19. DOC followed this same process in reviewing Duden's accommodation request. SER-48–49. Upon reviewing the essential functions of Duden's position, his working environment, and the medical and scientific evidence available at the time on the spread of COVID-19, DOC determined that Duden specifically could not be accommodated without imposing an undue hardship. SER-48–49, SER-159. *Varkonyi* is of no help to Duden.

43

For all the reasons above, the District Court correctly determined that accommodating Duden's religious beliefs would impose an undue hardship on DOC. This Court should affirm.

## II. DOC Initiated Good Faith Efforts to Accommodate Duden's Religious Practices

As explained above, once a plaintiff makes out a prima facie failure-to-accommodate case, the burden shifts to the employer to show *either* (1) "it could not reasonably accommodate the employee without undue hardship"; *or* (2) "it initiated good faith efforts to accommodate reasonably the employee's religious practices." *Petersen*, 2025 WL 2503128, at *4. The employer need only make one of these two showings to prevail. *See Balint v. Carson City*, 180 F.3d 1047, 1051 n.4 (9th Cir. 1999) (en banc) ("[A]n employer is not required to attempt or negotiate an accommodation when the employer can show that any accommodation would impose hardship.") (cleaned up). Thus, if this Court determines that the State met its burden to show that DOC could not reasonably accommodate Duden without undue hardship, this Court need not reach the issue of whether DOC initiated good faith efforts to reasonably accommodate him.[10]

---

[10] To the extent Duden argues that Title VII imposes freestanding liability for an employer's failure to engage in the interactive process, *see* Opening Br. at 16, he is mistaken. *See Kizer*, 2024 WL 4816856, at *3 (finding "no legal authority that would require employers considering Title VII accommodations . . . to engage in such a[n interactive] process"); *Miller v. Pt. Auth. of N.Y. & N.J.*, 788 F. App'x 886, 890 n.19 (3d Cir.

44

If this Court reaches this issue, however, the District Court correctly held that "despite good faith efforts to accommodate him, Plaintiff did not engage in discussions with Defendant DOC." ER-73. An employer's burden to initiate good faith efforts requires it to take "'some initial step to reasonably accommodate the religious belief of that employee.'" *Peterson*, 358 F.3d at 606 (citing *Heller v. Ebb Auto Co.*, 8 F.3d 1433, 1440 (9th Cir. 1993)); *Am. Postal Workers Union v. Postmaster General*, 781 F.2d 772, 776 (9th Cir. 1986) (per curiam) (recognizing that "it is incumbent upon the employer to undertake some initial steps to reach a reasonable accommodation of the particular religious belief at issue"). This duty requires that "the employer . . . negotiate with the employee in an effort reasonably to accommodate the employee's religious beliefs." *Heller*, 8 F.3d at 1440.

If an employer suggests a possible accommodation, this triggers "[a]n employee's 'concomitant duty' to cooperate" in "the search for an acceptable reconciliation of the needs of the employee's religion and the exigencies of the employer's business." *Id.* (quoting *Am. Postal Workers*

---

2019) (finding "meritless" plaintiff's argument that defendant "failed to engage in an 'interactive process'" where the Third Circuit has not "imposed [such a] duty on employers for Title VII religious accommodation claims"); *see also Howard v. HMK Holdings, LLC*, 988 F.3d 1185, 1194 (9th Cir. 2021) (Under ADA, "there exists no stand-alone claim for failing to engage in the interactive process. Rather, discrimination results from denying an available and *reasonable accommodation*.") (cleaned up).

45

*Union.*, 781 F.2d at 777, and *Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 69 (1986)). The "employee cannot shirk his duties to try to accommodate himself or to cooperate with his employer in reaching an accommodation by a mere recalcitrant citation of religious precepts." *Yott v. N. Am. Rockwell Corp.*, 602 F.2d 904, 908 (9th Cir. 1979) (cleaned up).

Here, DOC reviewed Duden's request for accommodation and his position description and determined that his facilitator duties could not be done remotely and that masking and testing alone had not resulted in safe operation of the prison environment. SER-48–49. DOC explained to Duden in a letter that the only reasonable accommodation was the possibility of reassignment. SER-156. The letter laid out the process for requesting reassignment, which involved emailing the DOC exemptions team and sending a copy of his resume. SER-156. The letter also offered Duden an opportunity to discuss the decision and other accommodation options with Dowler. SER-156. The letter further stated: "[i]f you choose not to seek reassignment, or discuss other accommodation options, you are required to be fully vaccinated against COVID-19 no later than October 18, 2021 or you will be separated from employment." SER-156.

Duden testified that he sent his resume to the Exemption and Accommodation Team. SER-90–91. But it is undisputed that he did not schedule a meeting with Dowler to discuss the decision or other accommodation options. SER-89. Rather, he "demand[ed]" that he be allowed to continue working while masking and testing or to work

46

remotely or be placed on paid administrative leave. SER-160–62. DOC again reviewed the essential functions of Duden's position and his working environment and determined that an accommodation was not possible. SER-159–60.

Based on this undisputed evidence, DOC suggested a possible accommodation, and Duden failed to fulfill his "concomitant duty" to cooperate in an acceptable reconciliation of his religious needs and the exigencies of DOC's business when he did not schedule a meeting with Dowler to discuss DOC's accommodation decision. *See Heller*, 8 F.3d at 1440. Thus, DOC met its burden to initiate good faith efforts to accommodate Duden, who shirked his duty to cooperate. *See id*; *see also Bruff v. N. Miss. Health Servs., Inc.*, 244 F.3d 495, 501 (5th Cir. 2001) (affirming summary judgment on Title VII failure-to-accommodate-religion claim where employer offered to give employee "30 days, and the assistance of its in-house employment counselor, to find another position . . . where the likelihood of encountering further conflicts with her religious beliefs would be reduced," which "fulfilled its obligations to offer her a reasonable accommodation").

Duden argues that DOC did not discuss the possibility of telework with him but "unilaterally decided it was not available to [him] and thus [DOC] did not engage in a truly interactive accommodation process." Opening Br. at 16. Again, however, DOC undisputedly offered Duden the opportunity to discuss its accommodation decision, SER-156, but Duden

47

is the one who failed to schedule a meeting. Moreover, DOC reviewed the essential functions of Duden's position and his work environment for a second time after Duden's "demand" to work remotely but determined (correctly) that it could not do so without undue hardship. SER-159–60. Therefore, Duden's contention that DOC "unilaterally" decided that telework was not possible for him is false.

Duden next argues that the State offered him "a reassignment position that was neither an open position [n]or a position that Mr. Duden could receive because he was not vaccinated," and thus "did not attempt to match Mr. Duden[']s capabilities with an available open position as set for[th] in *Goodman v. Boeing*[, 899 P.2d 1265, 1269–70 (Wash. 1995)]." Opening Br. at 18. But *Goodman* is inapposite. Not only did it involve a claim of *disability* discrimination, rather than religious discrimination, but it centered around whether the employer's duty "to take 'positive steps' to accommodate the employee's limitations" was even triggered in the first place. 899 P.2d at 1269. Further, nothing in *Goodman* requires that an alternative position actually be available for the employer to satisfy that duty. Rather, it states that "[r]easonable accommodation [ ] envisions an exchange between employer and employee . . . to achieve the best match between the employee's capabilities and *available* positions." *Id.* at 1269–70 (emphasis added). *Goodman* is of no help to Duden.

For all these reasons, DOC met its burden to initiate good faith efforts to accommodate Duden's religious beliefs.

48

## CONCLUSION

The State respectfully requests that the Court affirm the District Court.

RESPECTFULLY SUBMITTED this 29th day of September, 2025.

PACIFICA LAW GROUP LLP

s/ Zachary J. Pekelis
ZACHARY J. PEKELIS
MEHA GOYAL
 Special Assistant Attorneys General
PACIFICA LAW GROUP LLP
401 Union Street, Suite 1600
Seattle, WA 98101-2668
Telephone:  206-245-1700
Facsimile:  206-245-1750

Attorneys for Defendants-Appellees
State of Washington and Washington
State Department of Corrections

49

# CERTIFICATE OF SERVICE

I, Zachary J. Pekelis, hereby certify that I electronically filed the foregoing Defendants-Appellees State of Washington, Washington State Department of Corrections and the Washington State Reformatory's Answering Brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate Electronic Filing system on September 29, 2025.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

PACIFICA LAW GROUP LLP

*s/ Zachary J. Pekelis*
Zachary J. Pekelis, WSBA #44557
Meha Goyal, WSBA #56058
Special Assistant Attorneys General
401 Union Street, Suite 1600
Seattle, WA 98101-2668
Telephone:  206-245-1700
Facsimile:  206-245-1750
Attorneys for Defendants-Appellees
State of Washington, Washington State
Department of Corrections and the
Washington State Reformatory

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

*Instructions for this form:*
*http://www.ca9.uscourts.gov/forms/form17instructions.pdf*

**9th Cir. Case Number(s)**  <u>25-724</u>

The undersigned attorney or self-represented party states the following:

[ X ]  I am unaware of any related cases currently pending in this court.

[ ] I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

[] I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

**Signature**  <u>*s/ Zachary J. Pekelis*</u>   **Date** <u>September 29, 2025</u>
*(use "*s/[typed name]*" to sign electronically-filed documents)*

51

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:*
*http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** _____25-724_____

I am the attorney or self-represented party.

**This brief contains** 11,082 **words,** including __0__ words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5)and (6).

I certify that this brief *(select only one)*:

[**X** ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

53

[  ] complies with the length limit designated by court order dated
_____.

[  ] is accompanied by a motion to file a longer brief pursuant to Cir. R.
32-2(a).

**Signature** *s/ Zachary J. Pekelis*            **Date** September 29, 2025
*(use "*s/[typed name]*" to sign electronically-filed documents)*

53